# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **ERNEST AKEEM, as the** ) | |
| **Representative of the Estate of** ) | |
| **Ernest Hubbard, deceased,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. CV-02-RRA-0465-M** |
| ) | |
| **COMMISSIONER MICHAEL** ) | |
| **HALEY,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

Ernest Hubbard, the person who commenced this *pro se* action, now is deceased. He departed this life on October 11, 2003,[1] but his son and the personal representative of his estate, Ernest Akeem, was substituted as plaintiff on January 9, 2004.[2]  *See* Fed. R. Civ. P. 25(a).  Unless it is necessary for clarity to refer to Mr. Akeem in his representative capacity, however, this court shall employ the generic term "plaintiff" when discussing the claims that survived the death of Mr. Hubbard.

## I.  INTRODUCTION

Plaintiff filed an amended complaint on May 13, 2002, alleging that he was deprived of rights, privileges, or immunities afforded by the Eighth Amendment to

---

[1] *See* doc. no. 43 (Plaintiff's Response), ¶ 3 at 2.

[2] *See* doc. no. 38 (order granting motion for substitution).

the United States Constitution and federal statutes,[3] and he sought remedies for such deprivations under 42 U.S.C. § 1983.[4]   The action was assigned to one of the magistrate judges serving this court, Robert R. Armstrong, Jr.   The Magistrate ordered defendants to submit special reports responding to the issues raised in plaintiff's amended complaint, and advised plaintiff that these submissions would be treated as motions for summary judgment.[5]   Fewer than all defendants submitted special reports on September 30 and October 9, 2002, and plaintiff submitted his opposition on April 18, 2003, approximately six months before his death.[6]

## II.  FACTUAL BACKGROUND

Plaintiff filed claims against eleven defendants.   Michael Haley was the Commissioner of the Alabama Department of Corrections ("ADOC") during the period relevant to plaintiff's claims, and he supervised all operations of the State's prison system, including the St. Clair Correctional Facility ("St. Clair") located in Springville, Alabama.[7]   Ralph Hooks was the Warden of that facility.[8]   Donna Jones was "Chief Steward" of the prison, and her duties were to supervise the preparation

---

[3] *See* doc. no. 8 (amended complaint).

[4] *See id.*

[5] Doc. no. 9.

[6] Doc. nos. 21, 24, and 33.

[7] Doc. no. 21 (Special Report), Haley affidavit.

[8] *See id.*, Hooks affidavit.

2

and service of meals for inmates.[9]  James DeLoach was Warden of St. Clair prior to Hooks, but he was transferred to a different prison in July of 1998.[10]  Ron Jones and Martha Battles were ADOC employees who once worked at the St. Clair facility, but no longer do so.[11]  ADOC at one time contracted with Correctional Medical Services, Inc. ("CMS"), to provide medical services to St. Clair inmates, but terminated CMS's services on March 1, 2001.  ADOC thereafter contracted with NaphCare, Inc. ("NaphCare"), to provide medical services.[12]  Dr. William Hammack was employed by CMS, and then NaphCare, as "Medical Director" of the St. Clair facility.[13]  Dr. Andreas Maddux and Registered Nurse Jim Henson also were employed by both companies to provide medical care for St. Clair inmates.[14]

## A.    Plaintiff's Incarceration and Illness

Plaintiff was incarcerated in the St. Clair facility, beginning in October of

---

[9] *See id.*, Jones affidavit.

[10] *See id.*, DeLoach affidavit.

[11] Doc. no. 12.

[12] *See* doc. no. 24 (Special Report), Tab E, McLane affidavit; *id.*, Tab B, Hammack affidavit.

[13] *See id.*, Tab B, Hammack affidavit.

[14] *See id.*, Tab C, Maddux affidavit (establishing Maddux's employment with NaphCare) and doc. no. 33 (Plaintiff's Submission), Ex. I at June 21, 1999 letter to Commissioner Haley (indicating, by date, Maddux's employment with CMS); *see id.*, Ex. D, plaintiff's affidavit, ¶¶ 8, 11 (evidence that Henson provided medical attention to plaintiff before and after March 1, 2001, the date NaphCare commenced its medical contract with ADOC).

1996.[15]  He suffered from end-stage renal disease, a condition which required dialysis treatments three times each week.[16]  According to plaintiff's version of events, a pattern of medical abuse began in September of 1999, approximately three years into his incarceration.[17]  Sometime during that month, Dr. Maddux recommended that plaintiff's dialysis treatments be extended by an additional thirty minutes each session.[18]  "Nurse Jim" Henson disregarded these instructions, however: he unilaterally decided that plaintiff "did not need the extra half hour of treatment, [he] just needed a bigger needle, to allow more blood to flow."[19]  This procedure caused "severe pain and swelling" in plaintiff's arm.  When he complained, his concerns were "dismissed out of hand."[20]

The next incident occurred on or about February 10, 2001, when an attending nurse (a non-party described only as "Nurse Pritchard") failed to securely attach a tube from the dialysis machine to plaintiff's arm.  Blood flowed from his arm,

---

[15] Doc. no. 33 (Plaintiff's submission), Ex. D, plaintiff's affidavit, ¶ 1.

[16] *See id.*, ¶ 4; *see* doc. no. 21 (Special Report), attached dialysis chart (indicating that plaintiff received treatments on Mondays, Wednesdays, and Fridays).

[17] The pattern of abuse may have commenced prior to this time.  A group of St. Clair inmates, who remain unnamed, complained on September 30, 1998, that they were receiving inadequate medical care at the St. Clair facility.  Doc. no. 33 (Plaintiff's Submission), Ex. I, letter to Commissioner Joe Hopper dated September 30, 1998.

[18] *Id.*, June 21, 1999 letter to Commissioner Haley.

[19] *Id.*

[20] *Id.*

through the tube, and onto the floor.[21]

Plaintiff also experienced "blood pressure drop" during and after his dialysis treatments, as well as persistent diarrhea and resulting weight loss.[22]  He was prescribed medication to remedy these ailments.  When plaintiff asked Nurse Henson to dispense this medication on September 14, 2001, however, Henson responded, "[w]hat do you think I am, a pharmacy?" and warned plaintiff to "[m]ake it the last time you disturb me while I am watching TV."[23]

That same month, Dr. Maddux performed an eye examination on plaintiff. Maddux became concerned about plaintiff's "diminishing vision" and the "floaters" observed in his eyes, and instructed Henson to schedule an appointment for plaintiff with an optometrist.[24]  Several weeks later, when plaintiff asked Henson whether the appointment had been scheduled, Henson responded, "'I am not scheduling it, because I am a tax-payer and its [sic] a waste of my tax dollars."[25]

Plaintiff began to experience seizures during August of 2000.[26]  The seizures

---

[21] Doc. no. 33, (Plaintiff's Submission), Ex. D, plaintiff's affidavit, ¶ 11; *see also id.*, Ex. I, "CMS Medical Complaint Form" dated February 10, 2001.

[22] *See* doc. no. 33 (Plaintiff's Submission), Ex. D, plaintiff's affidavit, ¶ 11; doc. no. 24 (Special Report), Tab B, Hammack affidavit (explaining that "blood pressure drop" may result from dialysis treatments).

[23] Doc. no. 33 (Plaintiff's Submission), Ex. D, plaintiff's affidavit, ¶ 11; *See also id.*, Ex. F, "Naphcare Medical Complaint Form" dated September 17, 2001.

[24] *Id.*, Ex. D, plaintiff's affidavit, ¶ 11.

[25] *Id.*

[26] *Id.*, ¶ 8.

5

were accompanied by "hot flashes," "profuse sweating," "dizziness," and "blackouts."[27]  Plaintiff did not know the cause of these seizures, but they usually occurred three to four hours after his dialysis treatments.[28]  According to plaintiff,

> I have repeatedly complained and signed up for sick call for this problem.  I received no treatment or evaluation for this problem for almost 18 months.  The only person who actively engaged in any form of treatment was Henson, who told me, "We could figure it out if we gave you GFR [Globular Filtration Rate] tests, but, they are too expensive."[29]

Plaintiff complained on June 3, 2002 that, "[i]n my most recent conversation with Nurse Henson, he advised me that there is nothing further that they will be doing to address the seizures and related problems.  This has been confirmed by Dr. Maddux and the rest of the medical staff."[30]  Dr. Maddux told plaintiff on an unspecified date, however, that the cause of his seizures was "probably diet related."[31]

"Eventually, [the cause of the seizures] was correctly diagnosed as low blood-sugar levels which were exasperated [sic] by the dialysis treatments."[32]  Nevertheless, plaintiff complained that, "[b]ecause neither a GFR was done or any similar test, I suffered through violent seizures for over two years": *i.e.*, from August of 2000 to

---

[27] *Id.*; *id.*, Ex. E.

[28] *Id.*

[29] *Id.*, Ex. D, plaintiff's affidavit, ¶ 8; *see also id.*, ¶ 4.

[30] Doc. 33 (Plaintiff's Submission), Ex. E.

[31] *Id.*, Ex. D, plaintiff's affidavit, ¶ 8.

[32] *Id.*

approximately August of 2002.[33]  Plaintiff did not specify how many seizures he suffered during this period, or the dates on which they occurred.

Plaintiff also claimed that, "during the past several years" preceding 2003, he had undergone "at least five (5) surgeries performed at outside hospitals."[34]  At least three of these surgeries were "of the emergency variety because of either delay or failure to treat infections in the grafts of [his] arm.  One of the surgeries followed a particularly nasty swollen arm after an 'infiltration' episode which went untreated for over a week."[35]

Plaintiff addressed written correspondence to ADOC Commissioner Haley on June 21, 1999, September 17, 2001, and June 3, 2002, in which he complained that he was receiving inadequate medical care at the St. Clair medical facility.[36]  Haley has since denied personal knowledge of the incidents complained of by plaintiff.[37]

Plaintiff also submitted an "Inmate Request Slip" to Warden Hooks on February 12, 2001, to complain about the deficient medical care.[38]  There is no evidence that Hooks reviewed this complaint, or was made aware of it.

---

[33] *Id.*

[34] *Id.*, ¶ 10.

[35] *Id.  See also id.*, Ex. I at "CMS Medical Grievance Form" dated September 5, 2000 (plaintiff learned that an "infiltration episode" occurred during dialysis treatment, when blood was "pumped" under his skin).

[36] Doc. no. 33 (Plaintiff's Submission), Exs. H, I, and E.

[37] Doc. no. 21 (Special Report), at Haley affidavit.

[38] Doc. no. 33 (Plaintiff's Submission), Ex. I.

**B.      Inability to File Grievance**

CMS implemented a two-step grievance procedure.   Inmates were required to

file an "initial complaint" if dissatisfied with the medical care received; only after that

step was an inmate allowed to lodge a formal grievance.   Plaintiff complained that he

could not proceed to the second step of this process because he was denied grievance

forms.

> Initially, they (CMS) placed the grievance forms in the Shift Office.   In
> order to get a grievance, you had to show [an initial] complaint that had
> been answered [by a member of the CMS staff].   The problems that I
> encountered was that after you filed a complaint, the medical staff never
> returned it to you.   This prevented you from getting a grievance.[39]

NaphCare, the successor to CMS, implemented a similar, two-step procedure.[40]

An inmate was required to first file a medical complaint form with the appropriate

medical official.[41]   The form contained a section for the inmate's explanation of his

complaint, and a section for medical personnel to respond.   An inmate was allowed

to file a formal grievance only after receiving a response to the initial complaint.[42]

---

[39] Doc. no. 33 (Plaintiff's Submission), Ex. D, plaintiff's affidavit, ¶ 9.

[40] Doc. no. 24 (Special Report), at Exhibit F.

[41] For an example of the medical complaint form, *see* doc. no. 33 (Plaintiff's Submission), at Exhibit F.

[42] At the bottom of the medical complaint form is the following notation:  "IF YOU ARE UNSATISFIED WITH THE RESPONSE, YOU MAY FILE A MEDICAL GRIEVANCE USING THE NAPHCARE GRIEVANCE FORM" (doc. no. 33, at Exhibit F).   The grievance form states at the top:   "THIS GRIEVANCE WILL NOT BE RESPONDED TO UNLESS YOU HAVE PREVIOUSLY FILED A COMPLAINT WITH THE MEDICAL DEPARTMENT" (doc. no. 24, at Exhibit F).

Again, however, plaintiff claimed he was denied access to the second step.

> Since NaphCare took over, the grievances have been removed from the shift office and placed with the medical staff. They have continued to withhold the complaints after they have been filed. However, even if they do return a complaint back to you, they refuse to give you a grievance form.
>
> On one occasion, I was told "You have to file at least three complaints before you can get a grievance." To remedy this, I wrote an attorney named William Murray and got copies of the grievance forms from him. But, when I filed the grievance form, I was called up to the infirmary and told, since they had not given me the form, "It was no good." On other occassions [sic], you are just flat out denied a grievance form.[43]

Plaintiff was so dissatisfied with NaphCare's administration of its grievance procedure that he sent a letter to the company's corporate offices in Birmingham, Alabama, on September 17, 2001. He explained that "the failure to receive a response from my complaints has prevented me from filing a grievance under the system in place. If you have another office to deal with these complaints and matters, please inform me as [to] such."[44] There is no evidence that NaphCare ever responded.

## C.    Plaintiff's Diet

Plaintiff claimed that the food served to him at St. Clair was inappropriate, or even harmful, for someone with his medical condition. ADOC officials were

---

[43] Doc. no. 33 (Plaintiff's Submission), Ex. D, plaintiff's affidavit, ¶ 9.

[44] *Id.*, Ex. G.

ultimately responsible for deciding what meals were served to each inmate.[45]  ADOC nevertheless authorized NaphCare to prescribe foods that were suitable for consumption by dialysis patients.[46]  The kitchen staff at St. Clair was expected to adjust the meals for such patients in accordance with those instructions.[47]

Plaintiff expressed three concerns about his diet.  First, he complained that certain items in the prescribed diet were in fact harmful, rather than beneficial, to his medical condition.  Plaintiff made this determination based on a conversation he had with Dr. Maddux, who advised him that a particular brand of breakfast drink served at St. Clair was "inappropriate" and "unsuitable" for consumption by dialysis patients.[48]

Second, plaintiff complained that meals should have been tailored to the dietary needs of *each* dialysis patient, rather than to the needs of dialysis patients generally.  Again, he made this determination based on a conversation he had with Dr. Maddux, who advised him that the dietary needs of one dialysis patient could be "vastly

---

[45] *See* doc. no. 21 (Special Report), Jones affidavit ("The Plaintiff is served a diet that adheres as closely as possible to his needs and dietary requirements.  I have never told any Warden that I could not order anything I was asked to order by the Warden.  The only items that can be ordered are foods supplied by the central warehouse.  If the central warehouse does not stock the item I cannot get it.").

[46] *See* doc. no. 24 (Special Report), Tab B, Hammack affidavit (stating that a "dialysis diet is prescribed by the nephrologist"); doc. no. 21 (Special Report), Jones affidavit ("I was provided with copies of the dialysis patients' names with instructions to the kitchen provided by NaphCare.").

[47] *See id.*

[48] Doc. no. 33 (Plaintiff's Submission), Ex. D, plaintiff's affidavit, ¶ 3.

10

different" from another, and that each patient would benefit most from an "individualized diet."[49]  Plaintiff spoke with Dr. Maddux and Dr. Hammack about receiving such an "individualized diet."  Hammack informed him that while NaphCare could prescribe a generic "dialysis diet," it was up to ADOC officials — and not medical personnel — to decide whether to provide meals that were tailored to individual patients.[50]  Plaintiff spoke successively with Warden DeLoach and later Warden Hooks about receiving an individualized diet, but no such diet was ever authorized for him.[51]

Finally, plaintiff complained that Jones, the Chief Steward, occasionally fed him meals that were patently harmful.  Plaintiff sometimes completed his dialysis treatments after the general prison population had been fed, and the kitchen was closed.  Jones fed plaintiff sack lunches on these occasions, rather than preparing his regular, prescribed meal.  When plaintiff complained, he was "threatened with spit or poison in [his] food[,] or simply fed items that Jones knew or should have known were hazardous to dialysis patients."[52]  On more than one occasion, Jones told plaintiff, "'I don't care if you never eat.'"[53]  Plaintiff claimed that this was a "re-

---

[49] *Id.*, ¶ 4.

[50] *See supra* notes 45-47.

[51] Doc. no. 33 (Plaintiff's Submission), Ex. D, plaintiff's affidavit, ¶¶ 3, 6.

[52] *Id.*, ¶ 7.

[53] *Id.*

11

curring [sic] problem," although he did not specify how many times he was denied his regular meal.[54]

Plaintiff pointed to one identifiable occasion, November 20, 2000, when Jones refused to feed him in the kitchen after his dialysis treatment.[55]  Plaintiff enlisted the help of a prison sergeant, who instructed Jones to feed him.  Only then did Jones give plaintiff a peanut butter sandwich, a cheese sandwich, and a slice of sweet potato pie. Plaintiff ate the food, although he worried that all of these foods were harmful to his medical condition.[56]

### III. PROCEDURAL HISTORY

Plaintiff filed his first complaint on February 19, 2002,[57] and filed an amended complaint on May 13, 2002.[58]  He claimed that defendants "deprived him of a medically adequate diet and treatment for his conditions and have instituted policies and have continued practices which deprive him of medical care that is consistent with the [Eighth] Amendment or is so lacking as to in effect deprive him of needed medical attention."[59]  Plaintiff sought the following remedies under 42 U.S.C. § 1983:

---

[54] *Id.*

[55] *Id.*, Ex. I, at unnumbered page 4 ("CMS Medical Complaint Form").

[56] *Id.*

[57] Doc. no. 1.

[58] Doc. no. 8.

[59] *Id.*, section IV ("Statement of Claim") at 3.

12

(1) "injunctive relief in the form of a monitor to evaluate and correct the deficiencies in the treatment of the Plaintiff's condition"; (2) "compensatory damages"; (3) "punitive damages"; and (4) "required training for the medical and dietary staffs."[60]

In response to an order from the magistrate judge, to whom the action was assigned, defendants NaphCare, Hammack, Maddux, and Henson filed a special report, accompanied by copies of plaintiff's medical record, a copy of the NaphCare Grievance Procedure, and various affidavits.[61]  The ADOC officials also filed a special report, to which they attached various affidavits and copies of plaintiff's dietary worksheets.[62]  Defendants CMS, Ron Jones, and Martha Battles did not file special reports.

By order of the magistrate judge, the parties were advised that the defendants' special reports would be treated as motions for summary judgment.[63]  Plaintiff was advised that he was required to comply with Rule 56 of the Federal Rules of Civil Procedure in responding to the motions for summary judgment.[64]  Plaintiff filed a response to the special reports on April 18, 2003, and attached copies of his affidavit

---

[60] *Id.*, section V ("Relief") at 4.

[61] Doc. no. 24.

[62] Doc. no. 21.

[63] Doc. no. 29.

[64] *Id.*

and the affidavits of fellow inmates.[65]   The magistrate judge drafted an opinion granting all motions for summary judgment, and dismissing the action.  The opinion was referred to this court for review.  Shortly after the referral, however, Ernest Hubbard died.  Following plaintiff's death, his son, Ernest Akeem, moved the court to substitute him as the proper party, pursuant to Federal Rule of Civil Procedure 25(a)(1).[66]  This motion was granted on January 9, 2004.[67]  The court advised Akeem that the special reports filed in this action were construed as motions for summary judgment, and ordered him to file any evidence and briefs he had in response.[68] Akeem submitted a response on March 22, 2004.[69]  Upon consideration of all materials, this court affirms the magistrate judge, but only in part.

## IV. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but also that it "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c)

---

[65] Doc. no. 33.

[66] Doc. no. 37.

[67] Doc. no. 38.

[68] *Id.*

[69] Doc. no. 43.

(emphasis supplied).  Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## V. DISCUSSION

### A.    42 U.S.C. §1983

Section 1983 provides a means of seeking redress against governmental entities and officials whose conduct under color of state law deprives a plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal statutes.

The statute was enacted for the express purpose of enforcing the Fourteenth Amendment. *See, e.g., Mitchum v. Foster*, 407 U.S. 225 (1972).

The two essential elements of a § 1983 claim are: (1) the conduct complained of was committed by a person acting under color of state law; and (2) this conduct deprived plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *partially overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *see also Burch v. Apalachee Community Mental Health Servs., Inc.*, 840 F.2d 797, 800 (11th Cir. 1988) (*en banc*), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113 (1990).

**B.    Deliberate Indifference to Serious Medical Needs**

"The Constitution, on its face, says nothing about medical care due inmates." *Marsh v. Butler County*, 268 F.3d 1014, 1038 (11th Cir. 2001) (*en banc*).  Even so, in *Estelle v. Gamble*, 429 U.S. 97 (1976), "the Supreme Court interpreted the Eighth Amendment's words against 'cruel and unusual punishments,' and, for the first time, determined that governments — presented with an inmate with a serious medical condition — had an 'obligation to provide medical care for those whom it is punishing by incarceration.'" *Marsh*, 268 F.3d at 1038 (quoting *Estelle*, 429 U.S. at 102-105). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth

16

Amendment." *Estelle*, 429 U.S. at 104 (internal citation omitted).

"To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." *Kelley v. Hicks*, 400 F.3d 1282, 1284 (11th Cir. 2005). "First, a plaintiff must set forth evidence of an objectively serious medical need." *Id.* "A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* at 1284 n.3 (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir.2003)). "In either case, 'the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm.'" *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (alteration in original) (quoting *Farrow*, 320 F.3d at 1243).

"Second, a plaintiff must prove that the prison official acted with an attitude of deliberate indifference to that need." *Kelley*, 400 F.3d at 1284. "To establish that a prison official acted with deliberate indifference to a serious medical need, 'the prisoner must prove three facts:  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.'" *Id.* at 1284 n.4 (quoting *Brown*, 387 F.3d at 1351). The Eleventh Circuit has provided guidance on the first and third elements of this test.

### 1.   "Subjective knowledge of a risk of serious harm"

The first, "subjective knowledge of a risk of serious harm," ensures that a defendant will not be liable under the Eighth Amendment absent a "sufficiently culpable state of mind." *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (quoting *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996)) (in turn quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (internal markings omitted).   Hence, "liability may be imposed for deliberate indifference only if the plaintiff proves the defendant *actually knew* of 'an excessive risk to inmate health or safety' and disregarded that risk.  Proof that the defendant *should have* perceived the risk, but did not, is insufficient." *Campbell*, 169 F.3d at 1364 (emphasis supplied) (quoting *Farmer*, 511 U.S. at 837-38) (internal and other citation omitted).

"Of course, rarely if ever will a defendant medical professional admit that he knew his course of treatment was grossly inadequate but proceeded with that treatment anyway.  Therefore, plaintiffs necessarily must use circumstantial evidence to establish subjective mental intent." *Campbell*, 169 F.3d at 1371-72 (citing *Farmer*, 511 U.S. at 842; *Lancaster v. Monroe County*, 116 F.3d 1419, 1426 (11th Cir. 1997); *Steele v. Shah*, 87 F.3d 1266 (11th Cir. 1996)).   To decide this issue based on circumstantial evidence, a jury would inquire:  (1) whether the medical professional "was aware of facts about Plaintiff from which he could draw the inference that his

18

present course of treatment presented a substantial risk of serious harm to Plaintiff";

and (2) whether "he actually drew that inference." *Campbell*, 169 F.3d at 1370.

### 2.    "More than mere negligence"

The Eighth Amendment also requires that the treating physician's conduct

amount to something "more than mere negligence."  This analysis resembles an

objective inquiry, rather than a subjective one.  The Eleventh Circuit has "given

substance to *Estelle*'s distinction between 'deliberate indifference' and mere

negligence, explicating *categories of action or inaction* that may constitute deliberate

indifference." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (emphasis

supplied).

> For instance . . . "an official acts with deliberate indifference when he
> knows that an inmate is in serious need of medical care, but he fails or
> refuses to obtain medical treatment for the inmate." *Lancaster v.
> Monroe County*, 116 F.3d 1419, 1425 (11th Cir.1997).  Alternatively,
> "[e]ven where medical care is ultimately provided, a prison official may
> nonetheless act with deliberate indifference by delaying the treatment of
> serious medical needs, even for a period of hours, though the reason for
> the delay and the nature of the medical need is relevant in determining
> what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d
> at 1255.  For example, a defendant who delays necessary treatment for
> non-medical reasons may exhibit deliberate indifference. *Hill* [*v.
> Dekalb Reg'l Youth Det. Ctr.*,] 40 F.3d [1176,] 1190 n. 26 (11th Cir.
> 1994)]; *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir.1986)
> (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th
> Cir.1985)).

*Farrow*, 320 F.3d at 1246.

Deliberate indifference (as opposed to mere negligence) also may be established "by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment." *McElligott*, 182 F.3d at 1255 (11th Cir. 1999) (citing *Steele*, 87 F.3d at 1269-70; *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir.1989)). Furthermore, where an individual "intentionally interfere[s] with treatment once prescribed, the eighth amendment is violated." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (citing *Estelle*, 429 U.S. at 104-105) (internal citation omitted). Even if a prison physician provides "a period of attentive, competent care to [an inmate], one episode of gross conduct would be sufficient for a jury to make a finding of deliberate indifference." *Rogers*, 792 F.2d at 1062.

The Supreme Court's decision in *Estelle* drives home the distinction between "mere negligence" and "deliberate indifference." In *Estelle*, a prison physician *diagnosed* an inmate's lower back injury as "lower back strain," and *treated* the condition with "bed rest, muscle relaxants and pain relievers." 429 U.S. at 107. The inmate complained that "more should have been done by way of diagnosis and treatment, and suggest[ed] a number of options that were not pursued." *Id.* The Supreme Court observed that, while more testing could have been performed,

> the question [of] whether an X-ray or additional diagnostic techniques
> or forms of treatment is indicated is a classic example of a matter for
> medical judgment. A medical decision not to order an X-ray, or like

20

> measures, does not represent cruel and unusual punishment.  At most it
> is medical malpractice.

*Estelle*, 429 U.S. at 107.   Hence, "[a] core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by *failing to provide* care, *delaying* care, or providing *grossly inadequate* care, cause a prisoner to needlessly suffer the pain resulting from his or her illness."  *McElligott*, 182 F.3d at 1257 (emphasis supplied).

With these principles in mind, the court turns to the parties' contentions.

## C.   Medical Personnel

Jim Henson, Dr. Andreas Maddux, and Dr. William Hammack were employed by CMS, and subsequently NaphCare, to provide medical services to inmates at the St. Clair facility.  There are two preliminary issues which the court must address with regard to all of these defendants.

These defendants wisely do not dispute that they were persons "acting under color of state law" for purposes of liability under § 1983.  "That a privately employed prison physician acts under color of state law for the purposes of liability under 42 U.S.C. § 1983 remains well settled."  *Hinson v. Edmond*, 192 F.3d 1342, 1347 n.5 (11th Cir. 1999) (citing *West v. Atkins*, 487 U.S. 42 (1988); *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir. 1985)).

Nevertheless, these defendants contend that plaintiff's claims are due to be dismissed, without consideration on the merits, because plaintiff failed to exhaust administrative remedies.[70] They observe that, while plaintiff lodged initial complaints with CMS and NaphCare to protest his medical treatment, he never proceeded to lodge a formal grievance.  This argument is meritless.

"In an effort to stem the flood of prisoner lawsuits in federal court, Congress enacted the Prison Litigation Reform Act of 1995." *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (*en banc*).  One provision of the Act, 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies *as are available* are exhausted." (emphasis supplied).

In *Mitchell v. Horn*, 318 F.3d 523 (3rd Cir. 2003), the district court dismissed *sua sponte* a prisoner's claim under § 1997e(a) on the basis that he had failed to exhaust his administrative remedies.  *Id.* at 528-529.

> The District Court dismissed Mitchell's conditions-of-confinement claim, which asserts that he spent four days in a filthy cell in which he could not eat, drink, or sleep, because he "does not allege that he filed any grievances regarding the conditions of his cell."  Mitchell argues that he did not file a grievance because prison officials denied him the necessary grievance forms and, as a result, he lacked "available"

---

[70] Doc. no. 24 (Special Report), at 9-10.

administrative remedies.  *See Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) ("[A] remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a) ....") (alterations in original).  The Commonwealth acknowledges that the District Court incorrectly dismissed this claim because it did not consider Mitchell's allegations that he was denied grievance forms.

*Mitchell*, 318 F.3d at 529.  The Third Circuit reversed the district court's decision on the grounds that exhaustion is not a permissible basis for *sua sponte* dismissal.  The Court observed, however, that even if this were not the case, a prisoner's exhaustion requirement would be "excused if there were a failure to provide grievance forms." *Id.*

The Third Circuit's reasoning is persuasive.  The plain language of 42 U.S.C. § 1997e(a) requires a prisoner to exhaust such administrative remedies "as are available."  Here, plaintiff claimed that CMS employees denied him access to grievance forms, and that NaphCare employees either refused to provide him with grievance forms, or made it impossible for him to gain access to them.  Defendants may not credibly argue that plaintiff failed to avail himself of administrative procedures when he was denied access to that very process.  Plaintiff's failure to exhaust administrative remedies is excused, on the basis that appropriate grievance forms were never made "available" to him.[71]

---

[71] Henson argues that the Eleventh Circuit's decision in *Alexander v. Hawk*, 159 F.3d 1321 (11th Cir. 1998) is directly on point.  This court disagrees.  In *Alexander*, the Eleventh Circuit held that a prisoner must file a grievance to satisfy § 1997e(a)'s exhaustion requirements even when he

1.    **Jim Henson**

Nevertheless, Nurse Henson also contends that plaintiff's claims may be dismissed on any of the following grounds: (1) he was not deliberately indifferent to plaintiff's serious medical needs; (2) plaintiff did not suffer "physical injury" as required under the Prison Litigation Reform Act of 1995; or (3) he is entitled to receive the benefits of qualified immunity. The court will address these arguments in turn.

a.    **Deliberate indifference to serious medical needs**

The court must first determine whether Henson was sued in his individual capacity, official capacity, or both. The distinction between an "individual" and "official capacity" suit was summarized by the Supreme Court in *Kentucky v. Graham*, 473 U.S. 159 (1985):

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. See, *e.g.*, *Scheuer v. Rhodes*, 416 U.S. 232, 237-238 (1974). Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon* [*v. Holt*], 469 U.S. [464], at 471-472 [1985]. It is *not* a suit against the official

---

recognizes that doing so would be "futile" because it was certain to produce "inadequate" results. *See id.* at 1325-1326. Here, plaintiff did not pass over an opportunity to file a grievance. He was *denied access* to the process itself.

24

personally, for the real party in interest is the entity.  Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.  See, *e.g., Monroe v. Pape*, 365 U.S. 167 (1961).  More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a "moving force" behind the deprivation, *Polk County v. Dodson,* 454 U.S. 312, 326 (1981) (quoting *Monell*, *supra*, at 694); thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law.  *Monell*, *supra*; *Oklahoma City v. Tuttle*, 471 U.S. 808, 817-818 (1985); *id.*, at 827-828 (BRENNAN, J., concurring in judgment).  When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law.  See *Imbler v. Pachtman*, 424 U.S. 409 (1976) (absolute immunity); *Pierson v. Ray*, 386 U.S. 547 (1967) (same); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) (qualified immunity); *Wood v. Strickland*, 420 U.S. 308 (1975) (same).  In an official-capacity action, these defenses are unavailable.  *Owen v. City of Independence*, 445 U.S. 622 (1980); see also *Brandon v. Holt*, 469 U.S. 464 (1985).  The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment.  While not exhaustive, this list illustrates the basic distinction between personal- and official-capacity actions.

*Graham*, 473 U.S. at 166-67 (footnotes omitted) (emphasis in original).

When determining the capacity in which a governmental employee is sued, the

court looks "at the complaint and the course of proceedings."  *Colvin v. McDougall*,

25

62 F.3d 1316, 1317 (11th Cir. 1995). Here, because the course of proceedings is limited, the court must rely heavily on the face of the amended complaint. Relevant factors include the relief sought by the plaintiff, and the immunities and other defenses raised by the defendant. *See, e.g., Wilson v. Blankenship,* 163 F.3d 1284, 1288 n.5 (11th Cir. 1998). For instance, a request for punitive damages from a defendant indicates that the plaintiff intended to sue that defendant in his *individual* capacity only. As one other district court within this circuit has stated:

> In § 1983 actions, punitive damages are only available from government officials when sued in their individual capacities. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 268-70, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981); *see generally Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984) (State officials cannot be sued in their official capacities for damages.). Because Plaintiff may not obtain punitive damages from Defendants in their official capacities, the logical inference is that Plaintiff seeks punitive damages from Defendants in their individual capacities.

*See Adams v. Franklin,* 111 F. Supp. 2d 1255, 1262 (M.D. Ala. 2000).

Further, if a defendant asserts qualified immunity as a defense, the claim is presumed to be against that defendant in his individual capacity. *See Lundgren v. McDaniel,* 814 F.2d 600, 604 (11th Cir. 1987) ("Qualified immunity — the objective 'good faith' defense — is available only in a personal capacity lawsuit, not in an official capacity action."); *cf. Colvin*, 62 F.3d at 1317-18 (defendant's failure to raise qualified immunity indicated that the suit against him was in his official capacity

only).

Finally, other circuit courts of appeal have recognized that,

"under § 1983, a plaintiff may sue a [governmental] officer in [her] official capacity for alleged wrongs committed by the officer in [her] official capacity." *Price v. Akala,* 928 F.2d 824, 828 (9th Cir. 1990). It simply "does not follow that every time a public official acts under color of state law, the suit must of necessity be one against the official in his or her official capacity. *Melo v. Hafer,* 912 F.2d 628, 636 (3d Cir. 1990), *aff'd,* 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991).

*Powell v. Alexander,* 391 F.3d 1, 23-24 (1st Cir. 2004) (bracketed alterations in original).

The caption of the amended complaint lists as a defendant "Nurse Jim Henson."[72]   In Section III of the same document, "Jim Henson" is listed as an "additional defendant."  In Section IV, where plaintiff stated his claims, "Defendant Henson" is referred to three times, "Henson" three times, and "Supervisor Henson" once.[73]  Plaintiff's claims against Henson arise out of Henson's individual behavior; the complaint does *not* allege that Henson's conduct was the result of a "policy or custom" implemented by CMS or NaphCare.  Furthermore, plaintiff seeks punitive damages from Henson, which would not be recoverable in an official capacity action. Finally, Henson raised the defense of qualified immunity in his special report.  Based on these considerations, the court concludes that Henson was sued in his individual

---

[72] Doc. no. 8.

[73] *Id.*

capacity only.

With regard to his deliberate indifference claim, plaintiff alleged that Henson "denied him or g[ave] him inadequate medical care for his condition."[74]   Several incidents merit discussion.

### i.    Altering recommended course of treatment

Sometime in September of 1999, Dr. Maddux recommended that plaintiff's dialysis treatments be extended by an additional thirty minutes each session.  Nurse Henson, however, independently decided that plaintiff "did not need the extra half hour of treatment, [he] just needed a bigger needle, to allow more blood to flow."  This caused plaintiff to suffer "severe pain and swelling" in his arm.

As previously discussed, a plaintiff must satisfy four elements to prove an Eighth Amendment violation:  (1) there was a serious medical need; (2) the medical provider had subjective knowledge of a risk of serious harm; and (3) the medical provider disregarded that risk (4) by conduct that is more than mere negligence.

There was a serious medical need.  One medical encyclopedia defines end-stage kidney disease, also called end-stage renal disease, as "complete or near complete failure of the kidneys to function to excrete wastes, concentrate urine, and regulate electrolytes."[75]

---

[74] Doc. no. 8 (amended complaint), Section IV.

[75] *See* MedlinePlus Medical Encyclopedia at http://www.nlm.nih.gov/medlineplus/encyclopedia.html.

> End-state kidney disease occurs when the kidneys are no longer able to function at a level that is necessary for day to day life. It usually occurs as chronic renal failure progresses to the point where kidney function is less than 10% of baseline. At this point, the kidney function is so low that without dialysis or kidney transplantation, complications are multiple and severe, and death will occur from accumulation of fluids and waste products in the body.[76]

A reasonable jury also could infer that Henson, as the attending nurse who regularly cared for plaintiff, had actual knowledge that his deviation from the physician's instructions presented a substantial risk of serious harm to plaintiff's health. Nevertheless, he disregarded that risk. That this conduct rose beyond the level of "mere negligence" cannot be disputed, as Henson consciously and deliberately disregarded the doctor's instructions. An individual may violate the Eighth Amendment when he intentionally interferes with prescribed treatment. *See Rogers,* 792 F.2d at 1058.

The court concludes that Henson was deliberately indifferent to plaintiff's serious medical needs when he deviated from the course of treatment recommended by Dr. Maddux.

ii.     **Denying or delaying testing to diagnose plaintiff's seizures**

The court may infer the following facts from the evidence: plaintiff suffered

---

This encyclopedia database is a service of the United States National Library of Medicine and the National Institutes of Health.

[76] *Id.*

his first seizure in August of 2000; he suffered his last seizure in August of 2002; and he suffered an unspecified number of seizures during the course of this two-year period. The seizures were accompanied by hot flashes, profuse sweating, dizziness, nausea, severe disorientation, and blackouts. Sometime prior to June of 2002, Henson advised plaintiff that the cause of these ailments could be determined with Globular Filtration Rate tests, but that the tests would not be administered because they were "too expensive."

Plaintiff's seizures and accompanying symptoms constituted a serious medical need. *Cf. Lancaster v. Monroe County,* 116 F.3d 1419, 1427-28 (11th Cir. 1997) (indicating that seizures suffered as a result of alcohol withdrawal constituted a serious medical need).

A reasonable jury could also infer that Henson, as the attending nurse who regularly cared for plaintiff, had actual knowledge that the recurring seizures (and accompanying symptoms) presented a substantial risk of serious harm to plaintiff's health. Nevertheless, he disregarded that risk when he denied medical testing. A defendant who delays necessary treatment for non-medical reasons — such as the expense associated with testing — also exhibits deliberate indifference, rather than mere negligence. *See Farrow,* 320 F.3d at 1246 (citations omitted).

The court concludes that Henson was deliberately indifferent to plaintiff's

30

serious medical needs when he denied or delayed testing to diagnose the cause of plaintiff's seizures.

### iii.    Denial of medication

Plaintiff experienced "blood pressure drops" as a result of dialysis treatments, and also suffered persistent diarrhea which resulted in "weight loss."  Plaintiff was prescribed medication to remedy these ailments.  When plaintiff asked Henson to dispense this medication, however, Henson responded "[w]hat do you think I am, a pharmacy?," and told plaintiff to "[m]ake it the last time you disturb me while I am watching TV."

The court must first ask whether plaintiff suffered a serious medical need. "Blood pressure drops," without more, do not qualify.  *See Farrow*, 320 F.3d at 1243 n.14 (inmate's high blood pressure did not constitute serious medical need) (citing *Dickson v. Colman*, 569 F.2d 1310, 1311 (5th Cir. 1978)).

Persistent diarrhea also is not a serious medical need.  *Cf. Farrow*, 320 F.3d at 1243 n. 14 ("shaving bumps" would not constitute serious medical need) (citing *Shabazz v. Barnauskas*, 790 F.2d 1536, 1538 (11th Cir. 1986) (in turn holding that there was no Eighth Amendment violation where, due to a prisoner's "sensitive skin," he suffered "bleeding, inflammation, irritation, ingrowing of hairs, infection, purulence and pain," when prison officials forced him to shave his beard).

31

Weight loss also may not constitute a serious medical condition where, as here, there is no indication as to *how much* weight was lost. *See Farrow*, 320 F.3d at 1244 n.16, 1244-45 (holding that the following evidence, *in the aggregate*, constituted serious medical need: "pain, continual bleeding and swollen gums, two remaining teeth slicing into gums," and weight loss from 232 pounds to 212 pounds over a period of four months).

Nonetheless, the court concludes that all of the foregoing ailments, considered in the aggregate (and in the light most favorable to plaintiff), could constitute a serious medical need. *See id.* Blood pressure drops, accompanied by persistent diarrhea and resulting weight loss, could pose a substantial risk of serious harm to plaintiff if left untreated.

Further, a reasonable jury could infer that Henson, as the attending nurse who regularly cared for plaintiff, and who had the authority to dispense plaintiff's medication, had actual knowledge that these symptoms presented a substantial risk of serious harm to plaintiff's health. Nevertheless, he disregarded that risk when he refused to dispense plaintiff's medication. That this conduct rose beyond the level of "mere negligence" cannot be disputed, as Henson deliberately refused to dispense the medication. *See Lancaster,* 116 F.3d at 1425 ("[A]n official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he

32

fails or refuses to obtain medical treatment for the inmate.").

The court concludes that Henson was deliberately indifferent to plaintiff's serious medical need when he refused to dispense plaintiff's medication.

### iv.      Refusing to schedule appointment with optometrist

Dr. Maddux was concerned about plaintiff's "diminishing vision" and the "floaters" observed in his eyes.  He instructed Henson to schedule an appointment with an optometrist.  When plaintiff later asked about the appointment, Henson responded that he would not schedule it because "I am a tax-payer and its [sic] a waste of my tax dollars."

The court must first evaluate whether there was a serious medical need.  As previously discussed, a serious medical need is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  The fact that Dr. Maddux instructed Henson to schedule an appointment with an optometrist is not determinative, as plaintiff's condition was not *diagnosed* by a physician as *mandating* treatment.

The court also cannot conclude that a lay person would easily recognize the necessity for a doctor's attention.   The term "floaters" has been defined by an authoritative medical dictionary as "'spots before the eyes'; deposits in the vitreous

33

of the eye, usually moving about and probably representing fine aggregates of vitreous protein *occurring as a benign degenerative change.*" *Dorland's Illustrated Medical Dictionary* 640 (28th ed. 1994) (emphasis supplied).   From this definition, there is no indication that the presence of "floaters" would require a doctor's immediate attention, with the risk of substantial harm to plaintiff's health if left untreated.  Further, there is no evidence as to the extent of plaintiff's "diminishing vision."  As there is no evidence to demonstrate that plaintiff suffered from a "serious medical need," the court concludes that there was no Eighth Amendment violation with regard to this incident.

In sum, the following incidents evidence Henson's deliberate indifference to plaintiff's serious medical needs:   (1) Henson disregarded Dr. Maddux's recommendation that plaintiff's dialysis sessions be extended by an additional thirty minutes; (2) Henson advised plaintiff that the tests necessary to diagnose the cause of his seizures would not be administered because they were "too expensive"; and (3) Henson refused to dispense plaintiff's medication, telling him, "[w]hat do you think I am, a pharmacy?," and "[m]ake it the last time you disturb me while I am watching TV."

**b.    Showing of "physical injury" under 42 U.S.C. § 1997e(e)**

In the alternative, Henson contends that plaintiff's claims must be dismissed

34

because plaintiff did not suffer any "physical injury."[77]

Congress enacted 42 U.S.C. § 1997e(e) as part of the Prison Litigation Reform Act of 1995.  *See Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000).  This provision states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of *physical injury*."  42 U.S.C. § 1997e(e) (emphasis supplied).  "In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than *de minimis*."  *Mitchell v. Brown & Williamson Tobacco Corp.*, 294 F.3d 1309, 1312-13 (11th Cir. 2002) (citing *Harris v. Garner*, 190 F.3d 1279, 1286 (11th Cir.) ("*Harris I*"), *vacated*, 197 F.3d 1059 (11th Cir. 1999), *reinstated in relevant part*, 216 F.3d 970 (11th Cir. 2000) (*en banc*) ("*Harris II*"). The alleged injuries, however, need not rise to the level of being "significant." *Harris I*, 190 F.3d at 1286.

The Eleventh Circuit has "fus[ed] the physical injury analysis under section 1997e(e) with the framework set out by the Supreme Court in *Hudson* [*v. McMillian*, 503 U.S. 1 (1992)] for analyzing claims brought under the Eighth Amendment for cruel and unusual punishment." *Harris I*, 190 F.3d at 1286.  Therefore, precedent in

---

[77] *See* doc. no. 24 (Special Report) at 11-12.

the latter context may be instructive. *See id.* at 1287 (holding that a "dry shave," without more, does not allege a physical injury that is more than *de minimis*, and citing precedent in Eighth Amendment context as lending analogous support).

In *Siglar v. Hightower*, 112 F.3d 191 (5th Cir. 1997),[78] the Fifth Circuit held that "a sore, bruised ear lasting for three days" was *de minimis* physical injury and, therefore, a prisoner's claim for compensatory damages was precluded under 42 U.S.C. § 1997e(e). *Id.* at 193. In *Harris I*, the Eleventh Circuit indicated that injuries were *de minimis* where, due to a prisoner's "sensitive skin," he suffered "bleeding, inflammation, irritation, ingrowing of hairs, infection, purulence and pain" when prison officials forced him to shave his beard. *See Harris I*, 190 F.3d at 1286 (citing *Shabazz*, 790 F.2d at 1538).

On the other hand, in *Gomez v. Chandler*, 163 F.3d 921 (5th Cir. 1999), the Fifth Circuit held that a prisoner's injuries were greater than *de minimis* where he suffered "cuts, scrapes, contusions to the face, head, and body," and the prisoner had to receive "medical treatment" for these injuries. *Id.* at 924-925.

Construing the evidence in the light most favorable to plaintiff, he suffered the

---

[78] The Eleventh and Fifth Circuits have adopted the same standard to determine "physical injury" under 42 U.S.C. § 1997e(e): the injury must be more than *de minimis* but need not be significant. *See Harris v. Garner*, 190 F.3d 1279, 1286 (11th Cir. 1999) (*Harris I*), *vacated*, 197 F.3d 1059 (11th Cir. 1999), *reinstated in relevant part*, 216 F.3d 970 (11th Cir. 2000) (*en banc*) (*Harris II*) (citing *Gomez v. Chandler*, 163 F.3d 921, 924 (5th Cir. 1999)).

following injuries as a result of Nurse Henson's actions: "severe pain and swelling" in his arm; and "violent" seizures accompanied by hot flashes, profuse sweating, dizziness, nausea, severe disorientation, and blackouts. While pain and swelling *may* be *de minimis*, the court concludes that the "severe" pain and swelling experienced by plaintiff, and the violent seizures (and the accompanying symptoms) he suffered, rise to the level of "physical injury" under 42 U.S.C. § 1997e(e). Henson, therefore, may not defeat plaintiff's claims on this basis.

### c.    Qualified immunity

Finally, Henson claims that he is entitled to qualified immunity. This defense provides *governmental officials* with two types of protection: immunity from suit, and immunity from liability. The purpose of qualified immunity "is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, *see Anderson v. Creighton*, 483 U.S. 635, 638 (1987), protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)).

Immunity from suit is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "On summary judgment, the judge appropriately may determine, not only the currently applicable

law, but whether that law was clearly established at the time an action occurred." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Until this threshold immunity question is resolved, discovery should not be allowed," *id.*, nor should the case be permitted to proceed to trial. *See Mitchell*, 472 U.S. at 526.

While Henson assumes that he is entitled to raise the defense of qualified immunity, "[n]ot all defendants who may be sued under § 1983 are entitled to even claim [this] immunity." *McDuffie v. Hopper*, 982 F. Supp. 817, 822 (M.D. Ala. 1997). As a threshold matter, the court must ask whether Henson, a privately employed nurse, may raise this defense at all.

In *Richardson v. McKnight*, 521 U.S. 399 (1997), the State of Tennessee "privatized" the management of its correctional facilities so that a private firm, and not the state government, employed the prison guards who supervised inmates. *Id.* at 401-02. The Supreme Court held that these "private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case." *Id.* at 413 (citations omitted). The Court's reasoning was summarized by the Eleventh Circuit as follows:

> First, the Court determined that, although historically prisons had been run by both private and state actors, no "firmly rooted" tradition of immunity for privately employed prison guards had developed. *See* [*Richardson*, 521 U.S.] at 404-06. Second, the Court discussed three purposes of qualified immunity: (1) protecting against unwarranted

38

timidity on the part of government officials, (2) ensuring that talented candidates are not deterred from entering public service, and (3) preventing the distraction of governmental officials by lawsuits. The Court then concluded that, because of the influence of market forces on private employers, these same considerations did not support the extension of qualified immunity to the privately employed prison guards. *See id.* at 408-12.

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999), *amended on other grounds*, 205 F.3d 1264 (2000).

In *Hinson*, the Eleventh Circuit applied this same reasoning to conclude that a privately employed prison physician was not entitled to raise the defense of qualified immunity. In *Hinson*, Wexford Health Services ("Wexford"), a for-profit company, contracted with DeKalb County, Georgia, to provide medical services to inmates in the county jail. *Id.* at 1344. An inmate brought a § 1983 suit against a Wexford physician, who also served as the Medical Director of the county facility, alleging that the physician was deliberately indifferent to his serious medical needs. In holding that this defendant was ineligible to raise the defense of qualified immunity, the Eleventh Circuit first observed that there was no "firmly rooted" tradition of immunity for privately-employed prison physicians. *Id.* at 1345. The traditional purposes of qualified immunity also did not support an extension of the doctrine. There was no reason to fear that privately-employed physicians would be too "timid" in the performance of their duties. As long as the medical firm acted

independently of the government entity, the threat of losing the government's business (*i.e.*, "market forces") would provide strong incentives for the firm and its employees to provide optimum medical care. *See id.* at 1346-1347. A private firm also could attract skilled, competent employees with the promise of higher wages, increased benefits, and employee indemnification. *See id.* at 1347. Furthermore, although lawsuits might still distract employees from their duties, this alone was insufficient to extend the benefits of qualified immunity to privately employed physicians. *See id.*

Certainly, *Hinson* may be interpreted narrowly. The Eleventh Circuit instructed the parties to submit additional evidence on the issue of whether Wexford Health Services acted independently from DeKalb County. The Eleventh Circuit therefore had the opportunity to review the company's medical services contract, *see id.* at 1344 n.2, as well as anecdotal evidence regarding its autonomy in administering medical care to inmates. *See id.* at 1346-47. The parties in this case did not submit similar evidence.

The court concludes, however, that the burden was on the defendant, Nurse Jim Henson, to submit this evidence into the summary judgment record. Ordinarily, in order to receive qualified immunity, the initial burden of proof rests with the governmental official. *See Ferraro*, 284 F.3d at 1194 ("In order to receive qualified

immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."). Where, as here, a privately employed nurse wishes to receive the benefits of qualified immunity, he bears the initial burden to prove that he is entitled to raise the defense at all. *See McDuffie*, 982 F. Supp. at 824 (privately employed prison physicians were not entitled to raise defense of qualified immunity because these "[d]efendants have not shown that CMS [the medical firm] was strictly supervised by the State, or that CMS did not bid on this contract in order to achieve a profit," or that the firm or its employees "were merely briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision").

As Henson offers no further arguments to support his motion for summary judgment on grounds of qualified immunity, his motion will be denied with respect to plaintiff's allegations of altering the course of treatment prescribed by Dr. Maddux, denying or delaying testing to diagnose plaintiff's seizures, and refusing to dispense plaintiff's medication.

### 2.    Dr. Andreas Maddux

Dr. Andreas Maddux also provided direct medical care to plaintiff. Like defendant Henson, Maddux contends that plaintiff's claims may be dismissed on any

41

of the following grounds: (1) he was not deliberately indifferent to plaintiff's serious medical needs; (2) plaintiff did not suffer "physical injury" as required under the Prison Litigation Reform Act of 1995; or (3) he is entitled to raise the defense of qualified immunity.  These arguments will be addressed in turn.

### a.   Deliberate indifference to serious medical needs

Again, as a preliminary matter, the court must first determine whether Dr. Maddux was sued in his individual or official capacity, or both.  The court has reviewed the amended complaint, and concludes that Dr. Maddux was sued in both his official and individual capacities.[79]

The official capacity claim may be easily dismissed.  Plaintiff alleged in his amended complaint that Dr. Maddux "instituted a policy or procedure whereby the Plaintiff has suffered from delays which have caused infections in the grafts and lines."[80]  There is no evidence to support this allegation.

Plaintiff also alleged that Dr. Maddux "deprived [him] of a proper diet for his medical condition."[81]  This individual capacity claim also is baseless.  Dr. Maddux advised plaintiff that a particular brand of breakfast drink served at St. Clair was not appropriate for dialysis patients.  Dr. Maddux also advised plaintiff that an

---

[79] *See* discussion, *supra* § V(C)(1)(a).

[80] Doc. no. 8 (amended complaint), Section IV (Statement of Claims) at subpart I.

[81] *Id.* at subpart G.

"individualized diet" was preferable, because the nutritional needs of one dialysis patient could be "vastly different" from that of another.  Plaintiff did not claim that these recommendations were inappropriate; indeed, he concurred with them.

To establish an Eighth Amendment violation, plaintiff must prove (among other elements) that Dr. Maddux disregarded plaintiff's medical risks.  Plaintiff cannot satisfy this element where, as here, Dr. Maddux identified the risks associated with plaintiff's diet and advised him accordingly.  The fact that plaintiff never received a change in his meal plan is irrelevant, because there is no evidence that Dr. Maddux was responsible for prescribing plaintiff's diet, or that he had any authority to change it.

What remains is plaintiff's allegation that Dr. Maddux "denied him or g[ave] him inadequate medical care for his condition."  There is only one incident which merits discussion.

The court may infer the following facts from the evidence presented: plaintiff suffered his first seizure in August of 2000; he suffered his last seizure in August of 2002; and, he suffered an unspecified number of seizures during the course of this two-year period.  These seizures were accompanied by hot flashes, profuse sweating, dizziness, nausea, severe disorientation, and blackouts.  The evidence further establishes that sometime before June 3, 2002 (*i.e.*, at least two months before

plaintiff suffered his last seizure), Dr. Maddux "confirmed" that plaintiff would not receive medical testing to determine the cause of his seizures.  At some unspecified time, Dr. Maddux also advised plaintiff that his seizures were "probably diet related."

The seizures and accompanying symptoms constituted a serious medical need, for reasons discussed above.  A reasonable jury could also infer that Dr. Maddux, as an attending physician, knew his course of treatment (or lack thereof) presented a substantial risk of serious harm.  Dr. Maddux disregarded that risk when he denied medical testing and merely opined that Plaintiff's seizures were "probably diet related."  Furthermore, there was at least a two month lapse between Dr. Maddux's denial of the necessary tests, sometime before June 3, 2002, and the eventual administration of those tests, which the court may infer occurred on or about August of 2002, when plaintiff suffered his last seizure.  This delay constitutes the type of deliberate indifference prohibited by the Eighth Amendment.  *See Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994) ("Delayed treatment for injuries that are of a lesser degree of immediacy than broken bones and bleeding cuts, but that are obvious serious medical needs, may also give rise to constitutional claims . . . For these kinds of serious injuries . . . several weeks was too long to fail to properly respond to the medical need").

Dr. Maddux also has not offered an explanation for the delayed testing.  "When

prison guards [or treating physicians] ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (citations omitted).

The court concludes that Dr. Maddux was deliberately indifferent to plaintiff's serious medical needs when he delayed testing to diagnose plaintiff's seizures.

**b.   Showing of "physical injury" under 42 U.S.C. § 1997e(e)**

In the alternative, Dr. Maddux contends that plaintiff's claims must be dismissed because he did not suffer any "physical injury." As previously discussed, Congress enacted 42 U.S.C. § 1997e(e) as part of the Prison Litigation Reform Act of 1995 to limit prisoner litigation in federal courts. The provision states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

The court finds that seizures, accompanied by hot flashes, profuse sweating, dizziness, nausea, severe disorientation, and blackouts, constitute "physical injury" under § 1997e(e), for reasons discussed *supra,* § V(C)(1)(b). Dr. Maddux may not defeat plaintiff's claims on this basis.

**c.   Qualified immunity**

The court finds that Dr. Maddux is not entitled to raise the defense of qualified immunity, for reasons discussed *supra,* § V(C)(1)(c), with regard to Henson.

As Dr. Maddux offers no other arguments in support of his motion for summary judgment, his motion will be denied.

### 3.     Dr. William J. Hammack

Dr. William J. Hammack was employed by CMS, and then NaphCare, as Medical Director of the St. Clair facility.  Dr. Hammack contends that plaintiff's claims may be dismissed because he was not deliberately indifferent to his serious medical needs.  This court agrees.

### a.     Hammack's direct contacts with plaintiff

As a preliminary matter, the court must determine whether Dr. Hammack was sued in his individual or official capacity, or both.  The court has reviewed plaintiff's amended complaint, and finds that Dr. Hammack was sued in both his individual and official capacities.[82]

The official capacity claim is due to be dismissed.  Plaintiff stated in his amended complaint that "[d]efendant CMS and NaphCare Inc. have placed Dr. Hammack as its Medical Director, and allowed him to set policies whereby medical complaints are either or ignored or not addressed."[83]  There is no evidence to support

---

[82] *See* discussion, *supra* § V(C)(1)(a).

[83] Doc. no. 8 (amended complaint), at Section IV.

46

this allegation.

The individual capacity claims also are meritless.  Plaintiff alleged that "Dr. Hammack has routinely denied the Plaintiff follow-up care prescribed by outside medical specialists and denied the Plaintiff treatments that were otherwise prescribed."[84]  Again, there is no evidence to support this allegation.

Plaintiff also alleged that "the actions of . . . Hammack . . . have deprived the Plaintiff of a proper diet for his medical condition."[85]  Here, the record establishes that plaintiff conferred with Dr. Hammack about his diet on at least one occasion.  Dr. Hammack advised plaintiff that, while a NaphCare physician could prescribe diets which were suitable for dialysis patients in general, it was up to ADOC officials to decide whether "individualized" diets would be provided.[86]

To establish an Eighth Amendment violation, plaintiff must prove (among other elements) that Dr. Hammack's conduct was more than "mere negligence."  Certainly, a prison physician's conduct may evidence "deliberate indifference" when he denies or delays medical care.  However, the court could not locate any Eleventh Circuit decision that imposed Eighth Amendment liability on a physician for failing to provide care *which he did not have authority to administer*.  The court concludes

---

[84] *Id.*

[85] *Id.*

[86] *See* doc. no. 33 (Plaintiff's Submission), Ex. D, plaintiff's affidavit, ¶ 5.

that Dr. Hammack did not violate the Eighth Amendment because only ADOC officials — not medical personnel — determined whether "individualized" meals would be provided.

### b.    Supervisory liability

This does not end the inquiry, however, because the court must ask whether Dr. Hammack, as Medical Director of St. Clair, may be subject to supervisory liability. The Eleventh Circuit recently explained the contours of this theory in *Miller v. King*, 384 F.3d 1248 (11th Cir. 2004), saying that:

> It is [ ] "well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). Supervisory liability under § 1983 occurs only when "the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id*. A causal connection may be established: (1) *when "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [or she] fails to do so"*; (2) when "a supervisor's custom or policy results in deliberate indifference to constitutional rights"; or (3) when "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (internal punctuation, quotation marks, and citations omitted).

*Miller*, 384 F.3d at 1261 (emphasis supplied).  Of the foregoing, there is only one method of proof which merits discussion:  whether "a history of widespread abuse"

48

placed Dr. Hammack on notice of the need to correct the abuse, and he failed to do so.[87]   This method of proof entails a two-step process.  First, the court must ask whether there was a "history of widespread abuse."  "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant *and* of continued duration, rather than isolated occurrences." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) (emphasis supplied).  "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is *extremely rigorous*."  *Braddy v. Florida Department of Labor and Employment Security*, 133 F.3d 797, 802 (11th Cir. 1998) (emphasis supplied).  A single incident of abuse is insufficient.  *See Wilson v. Attaway*, 757 F.2d 1227, 1242 (11th Cir. 1985) ("[T]his single incident was [not] a 'history of abuse' . . . that it leads to an inference of failure by the mayor to supervise.").  *See also Cottone v. Jenne*, 326 F.3d 1352, 1361 (11th Cir. 2003) (holding that prison supervisors were not on notice of prison guards' failure to monitor inmates because the guards did not have "any past history, or even one prior incident, of failing to monitor inmates").

Further, multiple incidents of abuse also do not constitute a "history of widespread abuse," unless they occur with sufficient regularity and frequency.  This

---

[87] Otherwise, there is no evidence that:  Dr. Hammack personally participated in abridging Plaintiff's Eighth Amendment rights; that Dr. Hammack's custom or policy resulted in deliberate indifference to Plaintiff's serious medical needs; that he directed subordinates to act unlawfully; or that he knew subordinates would act unlawfully and failed to stop them from doing so.

is particularly true if the supervising official could not have easily discovered the abuse being perpetrated by his or her subordinates. *See Clark v. Evans*, 840 F.2d 876, 885 (11th Cir. 1988) ("However, it is clear that four cases in four years would have been insufficient to put Evans on notice, especially since the record is clear that such matters were handled at lower administrative levels and would not have come to the attention of Evans.").

Indeed, the standard for establishing a "history of widespread abuse" sufficient to impose supervisory liability is so stringent that this court could locate only one Eleventh Circuit decision which found the standard to be satisfied.  In *Cross v. State of Alabama*, 49 F.3d 1490 (11th Cir. 1995), female employees of a state mental health facility claimed that their immediate supervisor, Larry Stricklin, subjected them to sexual harassment in violation of Title VII.  *See id.* at 1494.  Furthermore, these plaintiffs brought § 1983 claims against Stricklin's supervisors — the Commissioner of the Alabama Department of Mental Health and Mental Retardation ("Department") and the Associate Commissioner for the mental illness division of the Department — on a theory of supervisory liability.  *Id.* at 1494, 1507-08.  At trial, seven female employees testified that they had been sexually harassed by Stricklin.  The abuse commenced as late as January of 1988 and persisted into the Fall of 1990, a period of approximately two and a half years.  *See id.* at 1494-98.  The witnesses testified

50

that sexual harassment was a *weekly*, if not *daily*, occurrence.

Stricklin required one female employee to meet with him two to three times a week from March of 1991 to August of 1991, and each meeting lasted two to nine hours. "The meetings consisted of Stricklin 'ranting, raging, yelling.'" *Id.* at 1494-95. Stricklen threw objects at one female employee and directed the following comment to her: "well, I guess women are taking over things." *Id.* at 1497. Another former employee recalled that "at meetings Stricklin paced around the room, and glared and yelled at female employees." *Id.* at 1496. Another employee overheard Stricklin say that "'women belonged barefoot and pregnant.'" *Id.* at 1495. Many other incidents of abuse persisted. One female employee resigned on August 1, 1991. Another resigned two weeks later, on August 15. A third resigned on February 18, 1990. A fourth resigned three months later, in May of 1990. *See id.* at 1495-98. One female employee recalled that "at least ten female nurses [had] either given notice or requested permission to transfer." *Id.* at 1496. One former employee appeared to sum up the feelings of her counterparts, explaining that she "'could no longer take the abuse, the verbal abuse, the angry outbursts. I was terrified every day I went into work . . . I was sick. I couldn't sleep, and I couldn't take it any longer.'" *Id.* at 1496.

The Eleventh Circuit held, without elaboration, that "Stricklin's conduct was 'obvious, flagrant, rampant, and of continued duration'" and, thus, constituted the

"history of widespread abuse" necessary to impose liability on Stricklin's supervisors. *Id.* at 1508.

In this case, the court may recite the following relevant evidence: (1) Nurse Henson disregarded Dr. Maddux's instructions and inserted a "bigger needle" in plaintiff's arm in June of 1999; (2) Nurse Henson denied plaintiff his dialysis-related medication on September 14, 2001; (3) sometime after September of 2001, Nurse Henson disregarded Dr. Maddux's orders to schedule an eye appointment for plaintiff; (4) plaintiff suffered at least two seizures and blackouts between August of 2000 and August of 2002, because Nurse Henson and Dr. Maddux delayed testing to determine the cause of these ailments; (5) plaintiff underwent five emergency surgeries at "outside hospitals" because of "either delay or failure to treat infections in the grafts of [his] arm."

Plaintiff also submitted the affidavit of James Edwards who, like plaintiff, was incarcerated at the St. Clair facility and also was diagnosed with renal deficiency.[88] Mr. Edwards stated that he was "receiving several different medications in conjunction with my renal problems," but that the nursing staff at St. Clair refused to dispense the medication to him. According to Edwards, his complaints regarding this matter were met with responses ranging from "Nurse Furlow's 'It ain't like it is going

---

[88] Doc. no. 33 (Plaintiff's Submission), Ex. B, Edwards affidavit, ¶ 2.

to kill you' . . . to Nurse Byrnes' 'So what.'"[89]

There is no question that this abuse was of "continued duration."  Plaintiff's complaints spanned from June of 1999 to February of 2002, a period of approximately two and a half years.  The court also concludes, but cautiously, that much of the abuse was "flagrant."  The Eleventh Circuit has not precisely defined the term "flagrant," or elaborated on its application, but it may be defined as "extremely, flauntingly, or purposefully conspicuous *usu.* because of uncommon evil, unworthiness, unpleasantness, or truculence."  *Webster's Third New International Dictionary* 862-863 (2002).  The latter part of this definition clearly applies in this case.  For example, construing the evidence in the light most favorable to plaintiff, Nurse Henson's conduct was certainly "unpleasant."  Nevertheless, whether the abuse was conspicuous is a different question; indeed, this leads to the next issue of whether the alleged abuse was "obvious."

"Obvious" may be defined as "capable of easy perception."  *Id.* at 1559.  It is unclear whether Henson's conduct was "capable of easy perception" by *the supervisor* to whom notice must be imputed.  *See Clark*, 840 F.2d at 885 ("However, it is clear that four cases in four years would have been insufficient to put Evans on notice, *especially since the record is clear that such matters were handled at lower*

---

[89] *Id.*, ¶ 9.

*administrative levels and would not have come to the attention of Evans.*") (emphasis supplied).   There is no evidence that Henson was abusive in the presence of Dr. Hammack, or any other third-party witness.  The same can be said for the nurses who denied Mr. Edwards his medication.  Furthermore, while plaintiff claims to have filed complaints with CMS and NaphCare regarding some of Henson's misconduct, it is unclear whether these complaints were reviewed, and if so, who reviewed them.  The theory of supervisory liability is premised on the notion that a history of abuse must become so obvious that *notice* may be imputed to a supervisor.  Where abuse is only "obvious" to the perpetrator and the victim, and is undetected by others, the weight of the evidence must necessarily be diminished.

This does not mean, however, that all incidents of abuse at St. Clair were not "obvious."  Plaintiff claimed that he underwent five emergency surgeries at outside hospitals because of delayed medical treatment.  He also suffered at least two seizures and blackouts due to delayed testing.  The remaining question, therefore, is whether the obvious (and even not-so-obvious) incidents at the St. Clair facility were so "rampant" as to constitute a history of widespread abuse.

Addressing the "obvious" incidents of abuse first, the court finds that five surgeries at outside hospitals, and at least two seizures and blackouts, do not together evidence "rampant" abuse.  This evidence is only slightly stronger than "four cases

in four years," *Clark*, 840 F.2d at 885, and it does not begin to approach weekly, if not daily, abuse directed at seven individuals, which has been recognized by the Eleventh Circuit to be "rampant."  *Cross*, 49 F.3d at 1494-98.

Of course, adding Nurse Henson's conduct (and that of the nurses who denied Mr. Edwards his medication) makes this a closer question.  Assuming for the sake of discussion that these events may also be considered, the court may count at least thirteen incidents, implicating at least four different medical personnel, during a period of approximately two and a half years.  This court concludes, based on the precedent established in *Cross v. State of Alabama*, that this, too, does not constitute "rampant" abuse.

Because plaintiff must prove that the abuse was "obvious, flagrant, rampant *and* of continued duration," the elimination of even one of these requirements must defeat supervisory liability.  There is no basis, therefore, to conclude that Dr. Hammack was deliberately indifferent to plaintiff's serious medical needs.  Dr. Hammack's motion for summary judgment is due to be granted, and the claims against him dismissed with prejudice.

**D.    Medical Firms**

**1.    NaphCare, Inc.**

ADOC contracted with NaphCare, Inc., to provide medical services to inmates

at St. Clair, beginning March 1, 2001.  A corporation providing prison medical services may be liable under § 1983 if it is established that the constitutional violation was the result of the corporation's policy or custom.  *See Buckner v. Toro,* 116 F.3d 450, 453 (11th Cir. 1997).

Plaintiff alleged in his amended complaint that NaphCare has "instituted a policy whereby the Plaintiff is deprived of necessary medical care because of the cost involved.  This is particularly evident during outpatient treatments or referrals whereby the orders and prescriptions or recommended treatments are changed and/or terminated."[90]  There is no evidence in the record to support this allegation.

Plaintiff also alleged that NaphCare has "instituted a policy or procedure whereby the Plaintiff has suffered from delays which have caused infections in the grafts and lines.  The infections and problems with grafts are ignored until they become so serious as to be extremely painful and life threatening."[91]  There is no evidence in the record to support this allegation.

Accordingly, the motion for summary judgment by NaphCare is due to be granted, and the claims against this defendant dismissed with prejudice.

### 2.    Correctional Medical Services, Inc.

This defendant did not file a special report in response to the Magistrate

---

[90] Doc. no. 8 (amended complaint), Section IV, subparagraph K.

[91] *Id.* at subparagraph I.

Judge's order.  Accordingly, the court makes no judgment with regard to this defendant.

## E.    ADOC Defendants

### 1.    Ron Jones and Martha Battles

Plaintiff was informed on August 19, 2002, that the Orders for Special Report mailed to defendants Ron Jones and Martha Battles had been returned to the court, because those persons were no longer employed at the St. Clair facility.[92]   The Magistrate Judge ordered plaintiff to provide correct addresses for Jones and Battle, and advised him that failure to comply with the order could result in the dismissal of his claims against those defendants.[93]   Plaintiff failed to comply with the order. Ernest Akeem, the representative of plaintiff's estate, also failed to comply. Accordingly, the claims against Ron Jones and Martha Battles are due to be dismissed for failure to prosecute, but without prejudice.  *See* Fed. R. Civ. P. 4(m).[94]

### 2.    Donna Jones

Donna Jones was employed by ADOC as Chief Steward of the St. Clair facility. As a preliminary matter, the court must ask whether Jones was sued in her individual

---

[92] Doc. no. 11.

[93] *Id.*

[94] Rule 4(m) of the Federal Rules of Civil Procedure provides: "If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant . . . ."

or official capacity, or both.  The court has reviewed plaintiff's amended complaint, and finds that Jones is sued in her individual capacity only.[95]

Plaintiff alleged that Jones "deprived [him] of a proper diet for his medical condition."[96]  The evidence establishes that, on more than one occasion, Jones denied plaintiff his regular meal which was prescribed to meet the nutritional needs of dialysis patients.  When plaintiff complained, he was either "threatened with spit or poison in [his] food[,] simply fed items that Jones knew or should have known were hazardous to dialysis patients," or not fed at all.  Jones told plaintiff on more than one occasion, "I don't care if you never eat."

Plaintiff pointed to one identifiable incident on November 20, 2000, when Jones initially refused to feed him after his dialysis treatment.  Plaintiff had to enlist the help of a prison sergeant, who instructed Jones to feed him.  Jones gave plaintiff a sack meal including a peanut butter sandwich, a cheese sandwich, and a slice of sweet potato pie.  Plaintiff ate the food, although he worried that all of these foods were harmful to his medical condition.

Jones acknowledged in her affidavit that she gave plaintiff a sack lunch on at least one occasion, when he missed his regular meal.  She stated that all sack lunches

---

[95] *See* discussion, *supra* § V(C)(1)(a).  The amended complaint only refers to "Donna Jones," and does not allege that her conduct was the result of any "policy or custom" endorsed by ADOC. *See* doc. no. 8 (amended complaint).

[96] Doc. no. 8 (amended complaint), Section IV, subpart G.

contained a peanut butter and jelly sandwich, a cheese sandwich, and a chicken salad sandwich, in addition to a "sweet" for dessert.[97]  Jones admitted that, "although sandwich spreads generally should be avoided [by dialysis patients] due to high sodium content, on occasion they are all right."[98]  She also stated that plaintiff "ha[d] been on dialysis [ ] for several years and [was] well aware of his diet restrictions.  The Plaintiff should have on his own not eaten the peanut butter and jelly sandwich and the sweet potato pie if it was served."[99]

Jones neither disputes that she was acting "under color of state law" in the performance of her duties as Chief Steward, nor that she was "deliberately indifferent" to plaintiff's serious medical needs.[100]  Even so, Jones contends that plaintiff's claims may be dismissed on either of two rationales:  (1) plaintiff did not suffer physical injury as required under the Prison Litigation Reform Act of 1995; or (2) she is entitled to receive the benefits of qualified immunity.  The court will address these arguments in turn.

      **a.**    **Showing of "physical injury" under 42 U.S.C. § 1997e(e)**

Jones contends that because plaintiff did not suffer any "physical injury" as a

---

[97] Doc. no. 21 (Special Report), Jones affidavit.

[98] *Id.*

[99] *Id.*

[100] *See* doc. no. 21 (Special Report), 4-5.

result of her actions, *all* of the claims against her must be dismissed.[101]  This court disagrees.  Jones *is* correct that there is no evidence that plaintiff suffered any physical injury as a result of her conduct.[102]  However, even absent a showing of "actual injury," § 1997e(e) would not preclude *all* of plaintiff's claims.  Plaintiff sought injunctive relief, punitive damages, and "compensatory damages" in his amended complaint.  Of course, the claim for injunctive relief was mooted by plaintiff's death.  Remarkably, while the plain language of § 1997e(e) says nothing of punitive damages, the Eleventh Circuit has stated that such damages also are barred, absent a showing of "physical injury."  *See Harris v. Garner*, 190 F.3d 1279, 1286-87 (11th Cir.) ("*Harris I*"), *vacated*, 197 F.3d 1059 (11th Cir. 1999), *reinstated in relevant part*, 216 F.3d 970 (11th Cir. 2000) (*en banc*) ("*Harris II*"); *see also Harris II*, 216 F.3d at 988 n.5 ("42 U.S.C. § 1997e(e) . . . precludes prisoners from bringing actions for . . . punitive damages.  It does not apply for declaratory or

---

[101] As discussed earlier, section 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

[102] One circuit court of appeals has left open the question whether a "palpable" physical injury is required under these circumstances. In *Robinson v. Page*, 170 F.3d 747 (7th Cir. 1999), a prisoner alleged that there was lead in the prison drinking water, that prison personnel knew this but refused to do anything about the matter, and that the lead was dangerous to his long-term health. *Id.* at 747-748.  The Seventh Circuit raised (but did not resolve) the question of whether "a present condition not injurious in itself but likely to ripen eventually into a palpable physical injury" may qualify as a "physical injury" for purposes of § 1997e(e). *Id.*  Absent more definitive guidance from circuit precedent, however, the court declines to explore whether plaintiff's alleged failure to receive a proper diet might eventually ripen into a "palpable physical injury."

injunctive relief.") (citing *Harris I*) (Tjoflat, J., concurring in part and dissenting in part).[103]   As plaintiff has not demonstrated any "physical injury," his claim for punitive damages also is barred.

This leaves plaintiff's claim for "compensatory damages," which may be parsed as follows:

> Compensatory damages generally fall into one of three categories: special, general, or *nominal damages*.  Special damages relate to specific pecuniary losses, such as lost earnings, medical expenses, and loss of earning capacity.  General damages include compensation for physical pain and suffering, as well as emotional distress.  *Nominal damages reflect the violation of a right with no proven actual injury.*

Karen M. Blum & Kathryn R. Urbonya, *Section 1983 Litigation* 109 (Federal Judicial Center 1998) (emphasis supplied).  The Eleventh Circuit has held that § 1997e(e) "bars any claim seeking compensatory damages for emotional distress suffered while in custody."  *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003).  The same case observed that, "[r]elying on the plain text of the statute, the Second, Third, Seventh, Ninth, and Tenth Circuits have interpreted § 1997e(e) not to preclude a prisoner from

---

[103] Other circuits disagree.  *See, e.g., Hubbard v. Taylor*, 399 F.3d 150, 166 (3rd Cir. 2005) ("Moreover, § 1997e(e) does not bar all such claims absent physical injury as claims for declaratory relief as well as nominal and punitive damages for violations of constitutional rights are not barred by § 1997e(e)."); *Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004) ("To the extent Royal argues nominal damages, punitive damages, and injunctive and declaratory relief are available to him, we agree.  Congress did not intend section 1997e(e) to bar recovery for all forms of relief."); *Calhoun v. Detella*, 319 F.3d 936, 941 (7th Cir. 2003) ("Although § 1997e(e) would bar recovery of compensatory damages 'for' mental and emotional injuries suffered, the statute is inapplicable to awards of nominal or punitive damages for the Eighth Amendment violation itself.").

seeking nominal damages," and remanded the claim to district court for consideration of this issue in the first instance. *Id.* at 1162-63.

The court finds that plaintiff's amended complaint, liberally construed, encompasses a claim for nominal damages. *See, e.g., Trawinski v. United Technologies*, 313 F.3d 1295, 1297 (11th Cir. 2002) ("'*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed.'") (quoting *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir.1998) (*per curiam*)).  This means that § 1997e(e) does not serve as a complete defense to plaintiff's claims against defendant Jones.

### b.   Qualified immunity

In the alternative, Jones claims that she is entitled to receive qualified immunity from plaintiff's claims.  "In order to receive qualified immunity, the public official must first prove that [she] was acting within the scope of [her] discretionary authority when the allegedly wrongful acts occurred."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (in turn quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988))).  This prerequisite is satisfied, as the amended complaint implicates Jones's actions which she undertook in the performance of her duties as Chief Steward.

The burden now shifts to plaintiff to show that qualified immunity is not appropriate. *Ferraro*, 284 F.3d at 1194 ("Once the defendant establishes that [she] was acting within [her] discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate."). *See also*, *e.g.*, *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("Once an officer or official has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff.") (citing *Suissa v. Fulton County*, 74 F.3d 266, 269 (11th Cir. 1996); *Barnette v. Folmar*, 64 F.3d 598, 600 (11th Cir. 1995); *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1150 n.3. (11th Cir. 1994) (*en banc*)).

A plaintiff must satisfy this burden by adhering to the two-part test established in *Saucier v. Katz*, 533 U.S. 194 (2001). The threshold question that must be asked by the district court is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. This requirement is satisfied because Jones was deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment.[104]

---

[104]As discussed earlier, to show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry. First, a plaintiff must set forth evidence of an objectively serious medical need. Second, a plaintiff must prove that the prison official acted with an attitude of deliberate indifference to that need. To establish that a prison official acted with deliberate indifference to a serious medical need, the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.

If a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine whether the right was "clearly established." *See id.*

> A right is clearly established if, in light of preexisting law, the unlawfulness of the official's conduct is "apparent." *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Storck* [*v. City of Coral Springs*], 354 F.3d [1307,] 1314 [(11th Cir. 2003)] ("If reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity."). This standard does not require that the specific conduct in question was previously found to be unlawful; the state of the law need only give an officer "fair warning" that his conduct is unlawful. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). In this way, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206.

*Cooper v. Dillon*, 403 F.3d 1208, 1220 (11th Cir. 2005). For purposes of examining preexisting law, the relevant case law consists of decisions by the United States Supreme Court, the Eleventh Circuit, and the highest court of the state in which the acts complained of occurred. *See, e.g., Marsh v. Butler County*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (*en banc*).

---

There is no doubt that end stage renal disease constituted a serious medical need. A reasonable jury also may find that Jones had "subjective knowledge of a risk of serious harm," although there is conflicting evidence on this issue. Jones stated that the contents of the sack lunches were "on occasion . . . all right." This is in tension with her statement, however, that plaintiff "should have on his own not eaten the peanut butter and jelly sandwich and the sweet potato pie if it was served." Construing the evidence in the light most favorable to plaintiff, the court concludes that the evidence is sufficient to create a genuine issue of material fact.

Next, Jones disregarded the risk of serious harm when she denied plaintiff his regular, prescribed meal. That this conduct was more than mere negligence cannot be disputed. A prison official acts with deliberate indifference when she denies medical care to an inmate.

Plaintiff claims that defendant Jones was deliberately indifferent to his serious medical needs on November 20, 2000, and on other occasions. The Supreme Court concluded in 1976, in *Estelle*, that deliberate indifference to serious medical needs constituted a violation of the Eighth Amendment. The Eleventh Circuit also established, as early as 1986, that non-medical prison staff could be held liable under this standard. *See Rogers v. Evans*, 792 F.2d 1052, 1058-59 (11th Cir. 1986).

The Eleventh Circuit has also held that the Eighth Amendment is violated when an inmate is denied a medically suitable diet. *See Howell v. Evans*, 922 F.2d 712 (11th Cir. 1991) ("*Howell I*");[105] *Howell v. Burden*, 12 F.3d 190 (11th Cir. 1994)

---

[105] This case has a complicated procedural history, as the Eleventh Circuit explained in *Howell v. Burden*, 12 F.3d 190 (11th Cir. 1994) ("*Howell II*"):

The first appeal, *Howell v. Evans*, 922 F.2d 712 (11th Cir.1991), came up from rulings denying motions of several defendants for summary judgment asserted on qualified immunity grounds.

.  .  .  .

After the decision of this court in the first appeal at 922 F.2d 712, appellees therein petitioned for rehearing and rehearing *en banc*. Subsequently they moved to withdraw the petition on the ground that the case had settled and moved that the judgment of the district court be vacated and the cause remanded with direction that the case be dismissed. This motion was granted April 29, 1991 by order published at 931 F.2d 711.

As it turned out the case had not been settled as to defendant Burden. Therefore, on June 24, 1991 this court entered the following order, which was not published:

"Appellees' and appellants' Mendoza and Correctional Medical Systems, Inc. motion to amend the April 29, 1991 order granting appellees' motion to withdraw the petition for rehearing and suggestion for rehearing en banc is GRANTED. That portion of the order which vacated the opinion at 922 F.2d

("*Howell II*").

In *Howell I*, an inmate at the Augusta Correctional and Medical Institution ("ACMI") suffered from severe asthma. *See* 922 F.2d at 715-16.  Charles Burden was Superintendent of ACMI and, sometime before July 1984, he received a memorandum from a physician that detailed the inadequacy of the inmate's medical care. *See id.* at 715, 722-23.  As explained in *Harris II*:

> The memorandum conveyed that [the inmate] was in serious condition, and that his needs for a proper diet, a smoke-free environment, and the assistance of a respiratory therapist and a clinical dietician could not be met at ACMI.  The memo described [the inmate] as having "severe extrinsic asthma," plus cardiac arrythmia with some of his medication.  It went on to say:
>
>> Although we were able to lower his dose of steroids the patient remains basically unchanged.  He wheezes daily, has severe exercise intolerance, and he becomes exhausted after walking about 20 feet.
>>
>> After submitting him to an allergy specialist for allergy testing he was found to be allergic to molds, trees, grasses, weeds, tomatoes, eggs, onions and probably sodium bisulfite which is a very common ingredient in most of our foods and many of our medications.  Moreover, he is obviously worsened by exposure to tobacco smoke, dust and other inhalants.
>>
>> He presently is scheduled to undergo hypo sensitization to some

---

712 and the judgment of the district court and remanded the case to the district court with direction that the case be dismissed is VACATED and the opinion at 922 F.2d is REINSTATED."

*Howell II* at 191 & n. "* " (text reformatted for clarity).

> of the many items to which he is allergic.  Meanwhile we have
> asked the offending foods be omitted from his diet, and that he be
> maintained away from exposure from dust and cigarette smoking.
> Up to this point we have not been able to provide him with a diet
> free of sodium biosulfite [sic], eggs, tomatoes, onions, and their
> products.
>
> . . . .
>
> Without conscientious professional support in areas of dietary and
> respiratory therapy we will be unable to manage Mr. Van
> Howell's symptoms because of the number and severity of his
> allergies.

*Howell II*, 12 F.3d at 192.  Despite this warning, Burden did not alter the inmate's

diet, or pursue other necessary treatment.  *See Howell I*, 922 F.2d at 722-23.  The

Eleventh Circuit held that this constituted deliberate indifference to the inmate's

serious medical needs.  *See id.*; *see also Howell II*, 12 F.3d at 192-93 (stating that, in

*Howell I*, "[w]e held that the record disclosed no indication that Burden did anything

to remedy the deficiencies in [the inmate's] care nor did he seek to obtain proper

equipment for his treatment").

   This court finds, therefore, that the state of the law in the year 2000 gave

defendant Jones "fair warning" that her actions were unlawful.  A reasonable officer

in Jones' position should have known that, when a special diet is prescribed to treat

an inmate's life-threatening medical condition, that diet must be provided.  Jones is

not entitled to receive qualified immunity, and her motion for summary judgment will

be denied.

### 2.    Warden James DeLoach

James DeLoach is a former Warden at the St. Clair facility, but he has not worked there since July of 1998.  DeLoach contends that plaintiff's claims must be dismissed because he was not deliberately indifferent to plaintiff's serious medical needs.  This court agrees.

As a preliminary matter, the court must determine whether DeLoach was sued in his individual or official capacity, or both.  The court has reviewed the amended complaint, and finds that DeLoach was sued in his individual capacity only.[106] Plaintiff stated in his amended complaint that "the actions of DeLoach . . . have deprived the plaintiff of a proper diet for his medical condition."[107]  The evidence establishes that plaintiff spoke with DeLoach sometime prior to July of 1998, and asked whether the prison might provide meals which were individualized to the special needs of each dialysis patient.  Plaintiff recalled that:

> When I spoke with DeLoach about the problem, he said "I will speak to the stewards about it."  When I spoke with him several days later he told me that the stewards had told him "they weren't going to order special food to feed diabetics & dialysis patients."  He told me [he] would look

---

[106] *See* discussion, *supra* § V(C)(1)(a).  Although the amended complaint refers to DeLoach as "Warden," plaintiff does not allege that DeLoach's conduct was the result of any "policy or custom" endorsed by ADOC.  *See* doc. no. 8 (amended complaint).

[107] Doc. no. 8 (amended complaint), Section IV at subpart G.

into this further.  The diet never did change.[108]

Neither incident constituted an Eighth Amendment violation.  DeLoach initially advised plaintiff that he had spoken with the stewards, and that they had rejected plaintiff's request for an individualized meal plan.  To prove that a prison official was deliberately indifferent to an inmate's serious medical needs, plaintiff must prove (among other elements) that the official's conduct was not "mere negligence." Plaintiff may not satisfy this element where, as here, DeLoach took steps to address his request for an individualized diet tailored to his medical needs.  DeLoach also advised plaintiff that he would "look into this further," but "[t]he diet never did change."  The court cannot reasonably infer, based on this conclusory assertion, that DeLoach's conduct rose beyond "mere negligence."

The court also finds no evidence to support a theory of supervisory liability. Plaintiff's earliest documented complaint regarding his medical care is dated September 30, 1998.[109]  DeLoach stopped working at St. Clair at least two months earlier, in July of 1998.[110]  DeLoach's motion for summary judgment, therefore, is due to be granted, and the claims against him dismissed with prejudice.

### 3.      Warden Ralph Hooks

---

[108] Doc. no. 33 (Plaintiff's Submission), Ex. D, plaintiff's affidavit, ¶ 6.

[109] *See id.*, Ex. I, September 30, 1998 letter to Joe Hopper.

[110] *See* doc. no. 21 (Special Report), at DeLoach affidavit.

Ralph Hooks was Warden of the St. Clair facility when plaintiff filed his amended complaint in 2002.  Hooks contends that plaintiff's claims are due to be dismissed because he was not deliberately indifferent to the plaintiff's serious medical needs.  This court agrees.

As a preliminary matter, the court must determine whether Warden Hooks was sued in his individual or official capacity, or both.  Upon review of the amended complaint, the court finds that Hooks was sued in his individual capacity only.[111] Plaintiff stated in his amended complaint that "the actions of . . . Hooks . . . have deprived the Plaintiff of a proper diet for his medical condition."[112]  The evidence establishes that Plaintiff spoke with Warden Hooks on at least one occasion about his diet.  The record does not specify when this (or these) conversation(s) took place, or the extent of the discussion(s).  Indeed, plaintiff merely attests, without elaboration, that he "personally talked to . . . Hooks . . . about the diet that I receive here from the dining hall."[113]

To prove that a prison official was deliberately indifferent to an inmate's serious medical needs, plaintiff must prove (among other elements) that the official

---

[111] *See* discussion, *supra* § V(C)(1)(a).  Although the amended complaint refers to Hooks as "Warden," plaintiff does not allege that Hooks's conduct was the result of any "policy or custom" endorsed by ADOC.  *See* doc. no. 8 (amended complaint).

[112] Doc. no. 8 (amended complaint), Section IV, subpart G.

[113] Doc. no. 33 (Plaintiff's Submission), Ex. D, plaintiff's affidavit, ¶ 3.

*actually knew* of an excessive risk to inmate health or safety.  It is not enough prove that the official *should have* known of the risk.  A reasonable jury cannot conclude, based on the scant evidence presented by plaintiff, that Warden Hooks possessed such actual knowledge.

Plaintiff also stated in his amended complaint that he "wrote letters to the . . . Wardens at the facility . . . [but] [n]one of my complaints have been addressed or corrected."[114]  The documentary evidence establishes that plaintiff submitted an "Inmate Request Slip" addressed to Hooks on February 12, 2001.  He attached a "CMS Medical Complaint Form" to this correspondence, which explained that "Nurse Pritchard" had improperly connected the dialysis machine to his arm, resulting in "substantial blood loss."[115]  There is no evidence that Warden Hooks reviewed plaintiff's Inmate Request Slip, or was made aware of it.  Again, a reasonable jury cannot conclude that Warden Hooks had actual knowledge of an excessive risk to plaintiff's health.

The court also may not hold Hooks liable under the theory of supervisory liability.  As previously discussed, "[s]upervisory liability under § 1983 occurs only when 'the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and

---

[114] Doc. no. 8 (amended complaint), Section II.

[115] Doc. no. 33 (Plaintiff's Submission), Ex. I.

the alleged constitutional deprivation.'"  *Miller v. King*, 384 F.3d 1248 (11th Cir.

2004) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)).  There is no

evidence that Hooks personally participated in the alleged unconstitutional conduct.

The remaining question, therefore, is whether plaintiff may establish a causal

connection between Hooks and an alleged constitutional deprivation.  As previously

discussed, a causal connection

> may be established: (1) when *"a history of widespread abuse puts the*
> *responsible supervisor on notice of the need to correct the alleged*
> *deprivation, and he [or she] fails to do so"*; (2) when "a supervisor's
> custom or policy results in deliberate indifference to constitutional
> rights"; or (3) when "facts support an inference that the supervisor
> directed the subordinates to act unlawfully or knew that the subordinates
> would act unlawfully and failed to stop them from doing so."

*Miller*, 384 F.3d at 1261 (alteration in original) (quoting *Cottone*, 326 F.3d at 1360).

Of the three, foregoing considerations, only one merits discussion here: *i.e.,* whether

there was a "history of widespread abuse" that put Hooks on notice of the need to

correct the alleged deprivation, and he failed to do so.[116]

For a "history of widespread abuse" to exist, the alleged abuse must be

"obvious, flagrant, rampant *and* of continued duration."  *Brown v. Crawford*, 906

F.2d 667, 671 (11th Cir. 1990) (emphasis supplied).  Warden Hooks supervised

---

[116] Otherwise, there is no evidence that Hook's "custom or policy" resulted in deliberate
indifference to plaintiff's serious medical needs, that Hooks directed his subordinates to act
unlawfully, or that he knew that his subordinates would act unlawfully and failed to stop them from
doing so.

Donna Jones, the Chief Steward, who fed plaintiff peanut butter sandwiches and other foods which were harmful to his medical condition.  Even so, plaintiff has only identified one specific occasion when this occurred.  Construing the evidence in the light most favorable to plaintiff, the court may infer, at most, that similar incidents occurred on several more occasions.  The court cannot conclude, however, that such abuse was "rampant."

The court may also assume, for the sake of discussion, that Warden Hooks supervised the physicians and nurses who provided medical care to St. Clair inmates.[117]  As previously discussed, the aggregate abuse perpetrated by all medical personnel did not rise to the level of being "rampant."  Adding Jones's conduct to the sum does not alter that conclusion.

Based on the foregoing, the court concludes that plaintiff has not established that Hooks was deliberately indifferent to his serious medical needs.  Accordingly, Hooks's motion for summary judgment is due to be granted, and the claims against him dismissed with prejudice.

### 4.    Commissioner Michael Haley

---

[117] This assumption, of course, must be questioned in light of *Hinson v. Edmond*, 192 F.3d 1342 (11th Cir. 1999).  In *Hinson*, the Eleventh Circuit held that a privately employed prison physician was not entitled to qualified immunity.  The court reasoned, in part, that the physician (and the medical firm which employed him) acted *independently* of the governmental entity.  *See id.* at 1346-1347.  The parties have not submitted evidence on this issue in this case.

Michael Haley was Commissioner of the Alabama Department of Corrections when plaintiff filed his amended complaint in 2002.  Commissioner Haley contends that plaintiff's claims are due to be dismissed because he was not deliberately indifferent to plaintiff's serious medical needs.  This court agrees.

As a preliminary matter, the court must again determine whether Commissioner Haley was sued in his individual or official capacity, or both.  The court has reviewed the amended complaint, and finds that Commissioner Haley was sued in his individual capacity only.[118]  Plaintiff alleged in his amended complaint that "I wrote letters to the Commissioners [about deficient medical care] . . . [but] [n]one of my complaints have been addressed."  He also alleged that he wrote "correspondence and voiced complaints to the office of the Commissioner regarding the deficiencies in his necessary treatments.  The Commissioner [ ] ignored or failed to address any of the claims raised in those letters."[119]

Again, to prove that a prison official was deliberately indifferent to an inmate's serious medical needs, plaintiff must prove (among other elements) that the official actually knew of an excessive risk to inmate health or safety.  It is not enough prove that the official should have known of the risk.

---

[118] *See* discussion, *supra* § V(C)(1)(a).  Although the amended complaint refers to Haley as "Commissioner," plaintiff does not allege that Haley's conduct was the result of any "policy or custom" endorsed by ADOC.  *See* doc. no. 8 (amended complaint).

[119] Doc. no. 8 (amended complaint), Section II and Section IV.

Here, the evidence establishes that plaintiff addressed written correspondence to Commissioner Haley on June 21, 1999, September 17, 2001, and June 3, 2002, in each of which he complained about receiving deficient medical care at St. Clair. Even so, Commissioner Haley submitted an affidavit in response to plaintiff's claims denying personal knowledge of the incidents complained of in this case. There is no evidence, therefore, that Commissioner Haley had actual knowledge of plaintiff's serious medical condition. The court also may not impose supervisory liability on Commissioner Haley, for reasons discussed above.

Commissioner Haley's motion for summary judgment is due to be granted, and the claims against him dismissed with prejudice.

## V.  CONCLUSION

In accordance with all of the foregoing, the motions for summary judgment filed by defendants NaphCare, Inc., Dr. William Hammack, Warden James DeLoach, Warden Ralph Hooks, and Commissioner Michael Haley are due to be granted, and plaintiff's claims against these defendants dismissed with prejudice.

The motions for summary judgment filed by defendants Jim Henson, Dr. Andreas Maddux, and Donna Jones are due to be denied.

Plaintiff's claims against defendants Ron Jones and Martha Battles are due to be dismissed without prejudice.

This memorandum opinion makes no judgment with regard to plaintiff's claims against defendant Correctional Medical Services, Inc. ("CMS"), due to CMS's failure to respond to the Magistrate Judge's order to submit special reports responding to the issues raised in plaintiff's complaint.

An appropriate order will be entered contemporaneously herewith.

DONE this 13th day of June, 2005.

_____
United States District Judge